785 So.2d 422 (2001)
Byron BRYANT, Appellant,
v.
STATE of Florida, Appellee.
No. SC94902.
Supreme Court of Florida.
April 5, 2001.
*425 Michael Dubiner and Mark Wilensky of Dubiner & Wilensky, P.A., West Palm Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Byron Bryant.[1] We *426 have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. For the reasons expressed below, we affirm the judgment and sentence.
Byron Bryant was charged with first-degree murder for the December 16, 1991, killing of Leonard Andre, which occurred during the course of an armed robbery of Andre's Market in Delray Beach, Florida. Bryant was also charged with the armed robbery with a firearm as a result of this incident.
The evidence presented at trial revealed the following facts: On December 16, 1991, at approximately 8 p.m., Andre took the receipts of the day to the back of his store. Shortly thereafter, two men came into the store, one going to the back and one staying in the front. At gunpoint, one of the men ordered Andre's wife to open the cash register and demanded money, whereupon she took money from the cash register and gave it to one of the intruders. She then heard gunshots in the back of the store, and the men ran out. She found her husband in the back of the store lying on the floor with blood all around him. The autopsy determined that Andre had been shot three times at close range.
Police developed Bryant as a suspect only after several of his acquaintances contacted the police about his involvement in the murder. Subsequently, Bryant gave police a taped statement in which he admitted to killing Andre during a robbery attempt. In his statement to police, Bryant explained that he was with three other men on the night of the incident and was advised by one of them about the location of Andre's Market and that there was money in the store. Bryant went into the store and walked towards the back as though he were looking for the back room and asked for the bathroom; when Andre turned his back, Bryant pulled out his gun. Andre began to struggle and wrestle with Bryant over the gun, until Bryant got control of the gun and shot Andre. When Andre continued to fight, Bryant shot him again. After shooting Andre the third time, Bryant ran out of the store and left the scene. Bryant admitted in his statement that he shot Andre three times with a .357 magnum and admitted that he had a ski mask in his possession. Bryant told the detective that although he did not wear the ski mask, he dropped it when he ran from the store. During the investigation, a ski mask was found in the alleyway near the market.
After returning home from the scene at Andre's Market, Bryant asked his girlfriend to dispose of the gun he had used in the incident. He further admitted that the gun that was recovered from him at the time of his arrest was the same gun that one of his accomplices used during the incident at Andre's Market. At trial, however, Bryant denied any involvement in the robbery or killing, claiming his statement given to police was the result of police coercion.
A jury found Bryant guilty as charged. After Bryant waived his right to a jury for sentencing, the trial judge imposed the death penalty for the first-degree murder of Leonard Andre and life in prison for the armed robbery. The court found three aggravating circumstances applied to Bryant: he previously had been convicted of a capital or violent felony; the murder was committed during a robbery; and the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. See *427 § 921.141(5)(b), (d)-(e), Fla. Stat. (1999). The court found no statutory mitigating circumstances and only one nonstatutory mitigator, remorse, but gave it very little weight. The court concluded that the aggravating circumstances outweighed the mitigating circumstances, and sentenced Bryant to death by electrocution for the first-degree murder and life imprisonment for the armed robbery.
Bryant raises seven issues on appeal, claiming the trial court erred in the following: (1) determining that Bryant was competent to stand trial; (2) requiring Bryant to be held in visible restraints before the jury; (3) failing to properly evaluate the nonstatutory mitigating circumstance of Bryant's lack of education; (4) failing to evaluate the nonstatutory mitigator that Bryant lacked a positive role model; (5) failing to exercise its discretion in evaluating the nonstatutory mitigating factor of Bryant's neurological impairment; (6) finding the death sentence proportionate in this case; and (7) ruling that electrocution is not cruel and unusual punishment.

Guilt Phase
First, Bryant claims the trial court erred in finding Bryant competent to stand trial. "In determining whether a defendant is competent to stand trial, the trial court must decide whether the defendant `has sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as a factual understanding of the proceedings against him.'" Hardy v. State, 716 So.2d 761, 763-64 (Fla.1998) (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)); see also § 916.12(1), Fla. Stat. (1993); Fla. R.Crim.P. 3.211(a)(1). "The reports of experts are `merely advisory to the [trial court], which itself retains the responsibility of the decision.'" Hunter v. State, 660 So.2d 244, 247 (Fla.1995) (quoting Muhammad v. State, 494 So.2d 969, 973 (Fla. 1986)). "In situations where there is conflicting expert testimony regarding the defendant's competency, it is the trial court's responsibility to consider all the evidence relevant to competency and resolve the factual dispute." Hardy, 716 So.2d at 764 (citing Hunter, 660 So.2d at 247, and Watts v. State, 593 So.2d 198, 202 (Fla.1992)). "The trial court's competency decision will be upheld absent a showing of abuse of discretion." Hardy, 716 So.2d at 764 (citing Hunter, 660 So.2d at 247, and Watts, 593 So.2d at 202.)
After considering the evidence and observing Bryant's behavior in court, the trial court found Bryant competent to stand trial.[2] Although there were conflicting opinions from the experts on the issue of competency, it was in the sound discretion of the trial court to resolve the dispute.[3] Therefore, the trial court did not *428 abuse its discretion in finding Bryant competent to stand trial. See Hardy, 716 So.2d at 764 (holding trial court did not abuse discretion in finding defendant competent where there was conflicting expert testimony regarding the defendant's competency); see also Hunter, 660 So.2d at 247 (holding trial court did not abuse discretion in finding defendant competent where there was evidence to support that resolution); Turner v. State, 645 So.2d 444, 446 (Fla.1994) (holding "[a]lthough there was conflicting evidence during the pretrial competency proceedings, the trial judge did not abuse his discretion in finding Turner competent to stand trial"). Moreover, the lay and expert testimony presented support the trial court's resolution.
Second, Bryant argues the trial court erred in requiring Bryant to be tried while wearing restraints. As a general rule, a defendant in a criminal trial has the right to appear before the jury free from physical restraints, such as shackles or leg and waist restraints. See Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). This Court has recognized that restraining a defendant with shackles in view of the jury adversely impacts an accused's presumption of innocence. See Diaz v. State, 513 So.2d 1045, 1047 (Fla.1987); Elledge v. State, 408 So.2d 1021, 1022 (Fla.1981). However, a criminal defendant's right to be free of physical restraints is not absolute: "[U]nder some circumstances, shackling `is necessary for the safe, reasonable and orderly progress of trial.'" United States v. Mayes, 158 F.3d 1215, 1225 (11th Cir.1998) (quoting United States v. Theriault, 531 F.2d 281, 284 (5th Cir.1976)). "Courtroom security is a competing interest that may, at times, `outweigh[ ] a defendant's right to stand before the jury untainted by physical reminders of his status as an accused.'" Mayes, 158 F.3d at 1225 (quoting Allen v. Montgomery, 728 F.2d 1409, 1413 (11th Cir.1984)). Indeed, this Court has held that shackling is a permissible tool to be exercised in the sound discretion of the trial judge when circumstances involving the security and safety of the proceeding warrant it. See Derrick v. State, 581 So.2d 31, 35 (Fla.1991); Correll v. Dugger, 558 So.2d 422 (Fla.1990); Stewart v. State, 549 So.2d 171 (Fla.1989). "Shackles may be necessary to prevent the defendant from disrupting the trial ... and to protect the physical well-being of the jury, lawyers, judge, and other trial participants." Zygadlo v. Wainwright, 720 F.2d 1221, 1223 (11th Cir.1983).
*429 Prior to trial, the court ordered that Bryant be restrained, based principally upon Bryant's actions after his first trial where, upon hearing the verdict, he threw a chair in the direction of the prosecutor and jury, struggled with bailiffs, and shouted profanities while having to be forcibly restrained. The court offered Bryant the opportunity to wear an electronic belt which could be concealed underneath Bryant's clothing, in lieu of visible leg and waist restraints. Although Bryant objected to wearing any kind of restraints, he did initially agree to wear the electronic belt. On the day of the trial, however, Bryant refused to wear the electronic belt and requested not to be present if he was to be restrained. After a brief absence from the courtroom, Bryant requested that he be allowed back into the trial and, although he again objected to the use of any restraints, agreed to wear the leg and waist restraintswhich he did for the remainder of the trial.
Bryant argues it was error to deny an evidentiary hearing to determine whether restraints were necessary. We agree. In Bello v. State, 547 So.2d 914 (Fla.1989), this Court established the requirement that a hearing on necessity must precede the decision to shackle if a defendant timely objects and requests an inquiry into the necessity for the restraints. See also Finney v. State, 660 So.2d 674, 682-83 (Fla.1995). In Bello, after his conviction of first-degree murder, the defendant was shackled during the penalty phase of the trial. See Bello, 547 So.2d at 918. The trial court overruled defense counsel's objection without making inquiry into the necessity for shackling. Id. On appeal, this Court held:
Shackling is an "inherently prejudicial practice," and must not be done absent at least some showing of necessity. Because the trial judge in this case made no inquiry into the necessity for the shackling, the defendant is entitled to a new sentencing proceeding before a jury.
Id. (citation omitted).
Here, although defense counsel timely objected and requested that the trial court make inquiry into the necessity for the shackles, the trial court refused. Had the court held a hearing on this matter, it might have considered a variety of sources, including Bryant's prison records, witnesses, and correctional and law enforcement officials, to determine the necessity for restraining Bryant. In addition, Bryant would have had the ability to challenge the validity and import of the information provided. See Elledge v. Dugger, 823 F.2d 1439, 1451-52 (11th Cir.1987). Moreover, "[h]olding a hearing prior to permitting physical restraints allows the trial court to fashion procedures that minimize the risk of exposure of the restraints to the jury." Jackson v. State, 698 So.2d 1299, 1303 (Fla. 4th DCA 1997). Accordingly, the trial court erred in failing to conduct a separate hearing on the requirement of restraints for Bryant.
However, given the unrefuted evidence of Bryant's prior violent courtroom behavior and the unique circumstance of the trial court's personal knowledge of such conduct, such error was harmless. A review of the record reveals that Judge Mounts presided over both of Bryant's trials, and he personally witnessed Bryant throw a twenty-six-pound chair twelve feet through the air in the direction of the prosecutor and jury at the conclusion of his first trial. This act was accompanied by threats of violence and profanity, while bailiffs had to forcibly remove *430 Bryant from the courtroom.[4] Requiring restraints was not improper under these specific circumstances because the trial judge had first-hand knowledge of Bryant's incidents of inappropriate and dangerous courtroom behavior. See Mayes, 158 F.3d at 1225 (holding trial court's decision to restrain defendant with leg irons was reasonable as court properly factored into its decision defendant's prison disciplinary records and misconduct in prior judicial proceedings); see also Derrick, 581 So.2d at 35 (finding decision to shackle defendant proper where trial judge had knowledge that defendant had been found in possession of a screwdriver in jail); Stewart, 549 So.2d at 173-74 (affirming decision to require defendant wear restraints based upon court's knowledge of defendant's previous violence and allegations of an escape attempt).
Moreover, unlike the judge in Bello, Judge Mounts specifically entered the considerations supporting his decision into the record, and it is clear he based his decision on these prior violent incidents, and not on any specific deference to the correctional staff, as argued by Bryant.[5] Clearly these acts were forefront in the judge's mind when he denied evidentiary hearings or the removal of restraints, even though he stated on a couple of occasions that he would defer to the corrections staff. The court's decision to consider and agree with the recommendation of corrections staff was an informed one, based primarily on the judge's own observations of Bryant's previous violent action. Furthermore, the defense did not take exception to these facts, nor did the defense proffer or attempt to proffer any significant change in circumstance that would indicate to the court that its decision would be an abuse of discretion.[6]
Finally, although not raised by Bryant, we find sufficient evidence to support Bryant's convictions for first-degree murder and armed robbery. Finding no reversible error as to the guilt phase of Bryant's trial, we affirm his convictions.

*431 Penalty Phase

Bryant raises four issues relating to the penalty phase proceedings. First, Bryant argues the trial court erred in failing to properly evaluate the nonstatutory mitigating circumstances of Bryant's lack of education. Specifically, Bryant claims, the court erred when it predicated part of its rejection of the lack of education mitigator upon a defense witness's testimony that Bryant "was a good student through the 12 years they attended school together," when there was also testimony from the same witness that the two were geographically separated when Bryant was age thirteen.
In Chandler v. State, 702 So.2d 186 (Fla.1997), this Court reiterated the approved procedure by which the trial court must address mitigating circumstance evidence:
The sentencing judge must expressly evaluate in his or her sentencing order each statutory and non-statutory mitigating circumstance proposed by the defendant. This evaluation must determine if the statutory mitigating circumstance is supported by the evidence and if the non-statutory mitigating circumstance is truly of a mitigating nature. A mitigator is supported by evidence if it is mitigating in nature and reasonably established by the greater weight of the evidence.
Id. at 200 (quoting Ferrell v. State, 653 So.2d 367, 371 (Fla.1995)). "As a general matter, if the trial court conducts the proper inquiry, it is within its power to determine whether mitigating circumstances have been established by a preponderance of the evidence." Knight v. State, 746 So.2d 423, 436 (Fla.1998) (citation omitted) (citing Foster v. State, 679 So.2d 747, 755 (Fla.1996)). "A trial court may reject a defendant's claim that a mitigating circumstance has been proved if the record contains competent substantial evidence to support the trial court's rejection of the mitigating circumstance." Spencer v. State, 645 So.2d 377, 385 (Fla.1994). In this instance, there is substantial competent evidence to support the trial court's rejection of Bryant's alleged nonstatutory mitigating circumstance of lack of education and, therefore, the trial court did not abuse its discretion.
Although Bryant is technically correct in his argument that the trial court misstated defense witness Gaines' testimony, this misstatement does not undermine the conclusion that the mitigator was not established by the greater weight of the evidence.[7] Bryant's mother, Veonice Bryant, testified Bryant "was a very good student... [a]nd he still was a good student for a while after we moved [to Florida]." Greg Otto, a licensed clinical social worker testified that Bryant revealed to him that he was getting B's and C's and doing well in school in Connecticut. Otto testified that although Bryant's grades declined after moving to Florida, his formal education was completed through the tenth grade. Moreover, Gaines testified that he and Bryant have kept in touch via letters and telephone about "once every three weeks or a month or so" from the time that Bryant was sixteen. Gaines opined that Bryant was able to articulate and speak *432 intelligently regarding Bible scriptures and regarded Bryant as being above average in intelligence. When questioned specifically about Bryant's ability in school, Gaines responded, "He did very well." In addition, the trial court noted in its sentencing order that:
[P]sychological evaluations of the Defendant were performed by Dr. Susan La-Fehr Hession and Dr. Stephan Alexancer [sic], forensic professionals with many years of experience. The Defendant was found to be of average to above average intelligence. This is supported by the record.
Therefore, although it would appear unlikely that Gaines and Bryant attended school together for exactly twelve years (as the trial court suggested in the sentencing order), this does not detract from the essence of Gaines' comment and the remainder of the record evidence upon which the trial court based its rejection of the lack of education mitigator. With this testimony, as well as the judge's observations of Bryant's courtroom discussions and pro se filings, the judge was not required to follow the defense expert's conclusions that Bryant had a low ability to learn or lacked education. See Rose v. State, 617 So.2d 291, 293 (Fla. 1993) ("The trial court has broad discretion in determining the applicability of mitigating circumstances and may accept or reject the testimony of an expert witness.") (citing Roberts v. State, 510 So.2d 885, 894 (Fla.1987)). Because the trial court's rejection of the nonstatutory lack of education mitigating circumstance is supported by competent substantial record evidence, it cannot be said the trial court abused its discretion in reaching its conclusion; therefore, we find no error. See Sireci v. State, 587 So.2d 450, 453-54 (Fla.1991) (stating that when presented with conflicting testimony, trial judge could properly conclude that mitigating circumstances had not been proven).
Next, Bryant claims the trial court erred in failing to evaluate the nonstatutory mitigator that Bryant lacked a positive role model, arguing the trial court had an obligation to explain its rejection of this mitigator in its sentencing order beyond the summary statement that the evidence was "extremely conflicting." We find this claim is also without merit.
In Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990), this Court established the following guidelines to promote the uniform application of mitigating circumstances:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature.... The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance.[8]
(Footnote and citation omitted.) Such documentation is necessary to assure this Court that the trial court has properly evaluated and weighed each mitigating circumstance proposed by the defendant, as well as to permit this Court a meaningful *433 review of the sentencing order. See Walker v. State, 707 So.2d 300, 319 (Fla.1997).
In the instant case, the trial judge made the following findings in his sentencing order with regard to the mitigation at issue:
The third asserted mitigator is that he lacked a positive male role model. This Court finds the evidence to be extremely conflicting and, therefore, does not manifest itself as a mitigator.
Sentencing Order at 9, State v. Bryant, No. 92-791A02 (Fla. 15th Cir.Ct. Feb. 5, 1999). Although the trial court did not paraphrase the record testimony provided by various parties with respect to the proposed lack of positive role model mitigating circumstance, it cannot be said that the trial court did not "expressly evaluate in its written order [the] mitigating circumstance proposed by [Bryant] to determine whether it is supported by the evidence," as is required by Campbell.[9] Moreover, instead of recounting the specific allegations and commensurate denials of abuse, the trial court succinctly stated the testimony was "extremely conflicting" and, thus, determined the mitigating circumstance was not supported by the evidence. The sentencing order expressly identified this mitigating factor and, while it was discussed only briefly, it is clear the court found the mitigation was not proven by the greater weight of the evidence due to the conflicting testimony. Thus, this Court is not precluded from a meaningful review of the sentencing order. See Walker, 707 So.2d at 319.
Furthermore, a review of the factual circumstances and reasoning contained in Campbell and its progeny reveals that the trial court, in this instance, did not "fail to evaluate" Bryant's proposed nonstatutory mitigator. For example, in Campbell we concluded that the trial judge erred when he summarily dismissed the proposed mitigating factors of impaired capacity and deprived/abused childhood without any evaluation of the proposed mitigators, i.e., he discounted them entirely without stating any reason or explanation for doing so. See Campbell, 571 So.2d at 418-20. Although evidence of impaired capacity in Campbell was "extensive and unrefuted" (i.e., defendant's IQ was in the retarded range; he read at a third grade level; he suffered from chronic alcohol and drug abuse; he was subject to borderline personality disorder; he attempted suicide in jail before being placed on a high-potency antipsychotic drug), the trial judge, without explanation, dismissed the mitigator without reason by stating that "[t]his mitigating circumstance is not applicable." Id. at 418 n. 1. The trial judge in Campbell also summarily dismissed without explanation the proposed nonstatutory mitigator of "deprived and abusive childhood," despite record evidence that the defendant required hospital treatment after being hit with a telephone, was observed covered with bruises, and was declared dependent so as to be permanently removed from his parents' home. Id. at 419 n. 2. In the instant case, however, the trial court did articulate its reason for rejecting Bryant's proposed mitigator, i.e., the evidence was "extremely conflicting."
In Foster v. State, 614 So.2d 455, 464-65 (Fla.1992), the defendant argued, like Bryant in the instant case, that "the trial court's sentencing order fails to evaluate *434 the proposed mitigating factors." In applying Campbell and Rogers v. State, 511 So.2d 526 (Fla.1987), this Court agreed and found reversible error in trial court's sentencing order:
[W]e cannot tell whether the court determined whether either of the two statutory mental mitigating circumstances existed. In fact, we are unable to say whether the court found any of the mitigating circumstances to exist or what weight was given to them.
Foster, 614 So.2d at 465. In the instant case, however, there is unmistakable clarity in the trial court's finding, as it is abundantly clear that the trial judge determined that Bryant's proposed mitigator of lack of a positive role model did not exist. See State v. Bryant, No. 92-791A02 (Fla. 15th Cir.Ct. Feb. 5, 1999).
Moreover, the trial court's conclusion is supported by competent substantial evidence in the record. See Mungin v. State, 689 So.2d 1026, 1031 (Fla.1995) (finding that trial court did violate Campbell when it did not specifically evaluate the substance of nonstatutory mitigation evidence in its sentencing order because record evidence supported trial judge's determination). According to defense witness Gaines, Bryant had a healthy, happy, normal childhood with a supportive father who may have had an affair with another woman. According to Otto, a licensed clinical social worker, the initial private investigator, Hillary Sheehan, was unable to discover any independent support for the allegations of abuse reported by Bryant, his siblings, and their mother, despite hundreds of hours of investigation. There were neither police reports nor neighbors who corroborated these claims. Otto acknowledged that while Bryant's father may not have been supportive, Bryant did have the support of his mother, teachers, classmates, and neighbors.
Bryant presented testimony accusing his father of violent acts against his wife which were made known to the children. Conversely, Bryant's father, Willie Bryant, denied all allegations of physical violence toward his family. Moreover, Bryant's mother admitted she did not report to the Connecticut police these alleged incidents of violence which purportedly occurred in Bridgeport before Bryant was thirteen years old.
Next, Bryant claims the trial court failed to exercise its discretion in evaluating the nonstatutory mitigating factor of Bryant's neurological impairment. Specifically, Bryant argues that the trial court failed to properly consider expert testimony that Bryant suffered from neurological defects of his brain that would cause a lack of impulse control and impaired judgment.
In its sentencing order, the trial court evaluated the evidence presented regarding Bryant's asserted mitigator of neurological impairment due to head injuries and meningitis. This evidence included both Bryant's medical records and expert testimony from a licensed psychologist that Bryant suffered from neurological defects of his brain.[10] As is its prerogative under Foster v. State, 679 So.2d 747, 755 (Fla.1996), however, the trial court properly concluded that the asserted mitigator was not established because "the evidence in this case does not show that *435 Defendant acted impulsively or had impaired judgment." Sentencing Order at 9. As this Court has stated, "[e]ven uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case." Foster, 679 So.2d at 755; see also Walls v. State, 641 So.2d 381, 390-91 (Fla.1994) (reasoning that opinion testimony "gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking").
In this instance, the trial court discounted the expert psychologist's testimony because Bryant's own actions belied the expert's testimony and conclusions. During the guilt phase of the trial, Bryant's taped confession was played in which he described the planning of the robbery, the selection of possible targets, the rejection of one target due to the number of people at the location, and the election of Bryant and Dexter Kirkwood to enter the second target's market because the victim did not know them, but knew the other accomplices. Bryant also described that when fighting with Andre for control of the gun, Bryant called to Dexter Kirkwood to shoot Andre, but Kirkwood fired no shots. Continuing to wrestle for the weapon, Bryant gained control of the gun when Andre released his grip, at which point Bryant shot him in the stomach. As Andre continued to struggle, Bryant shot him in shoulder area and then a third time, at point blank range, as Andre called for his wife. Bryant stated he was concerned because he knew Andre would die from the three shots from the .357 Magnum, and feared he would be identified by the victim's wife. Both guns used during the commission of the crime were Bryant's. Further, Bryant admitted knowing the crime was wrong and stated:
And the only reason that I shot the man because [sic] I had no choice. If he would have, I could see it in his face and how hard he was struggling to fight me. He was fighting for his life just like me. And it just so happened that I had a little more control of the gun which ended up killing him.
Bryant also confessed to calling the sheriff daily, on the pretense of a misdemeanor traffic warrant, in order to verify whether there was an arrest warrant for him. Clearly, the judge interpreted these acts as proof Bryant acted voluntarily with impulse control. As the trial court put it: "[Bryant's] actions on the night of the murder indicate that he understood what he was doing, why he was doing it, and that it was unlawful." See also Robinson v. State, 761 So.2d 269, 277 (Fla.1999) (affirming trial court's decision to give little weight to existence of brain damage because of the "absence of any evidence that it caused [the defendant's] actions on the night of the murder").
Moreover, a mitigating circumstance must be "reasonably established by the greater weight of the evidence." Nibert v. State, 574 So.2d 1059, 1061 (Fla. 1990). "The decision as to whether a particular mitigating circumstance is established lies with the judge. Reversal is not warranted simply because an appellant draws a different conclusion." Sireci, 587 So.2d at 453. In this instance, other than the testimony from Bryant's expert, there was no evidence of any manifestation of Bryant's alleged brain damage with respect to Bryant's criminality or any other aspect of his life. On the other hand, Mark Gaines, Bryant's friend since birth, saw no difference in Bryant's personality after his 1985 head injury. Gaines described Bryant as being fairly intelligent, articulate, and able to share sophisticated ideas on theology, religion, and scriptures. Further, the State produced evidence from Bryant's expert, Appel, that Bryant knew *436 the difference between legal and illegal, and established through the court-appointed mental health experts that Bryant was of average to above average intelligence, was able to control his behavior, and had no cognitive, emotional, or behavioral mental illness. According to a diagnostic radiologist, Bryant had an atrophy only to a very small portion of the brain, approximately 1/16 of the frontal lobe. No damage was found beyond that area and the injury was not degenerative. The brain stem was intact and working well as to the remainder of the frontal lobe. Therefore, based on the conflicting evidence in the record, we find the trial court did not abuse its discretion in rejecting this nonstatutory mitigator.
However, even if we were to conclude that the trial court erred in failing to find this mitigating circumstance, the error would be harmless beyond a reasonable doubt.[11] Bryant has prior violent felony convictions for sexual battery, robbery with a weapon, and aggravated assault with a mask; Bryant does not contest this aggravation. This Court has found prior violent felony convictions to constitute strong aggravation. See Marshall v. State, 604 So.2d 799, 806 (Fla.1992). Further, Bryant was involved with the armed robbery of Leonie Andre, the deceased victim's wife.
Fourth, Bryant claims the imposition of the death penalty in this case is disproportionate. Although he concedes that he intended to rob Andre's Market, Bryant argues it is clear that he had no intent to commit murder. He asserts the killing in this case resulted from an impulsive act, which occurred when Bryant found himself in an unexpected wrestling match for the weapon with the victim, and the only reason he shot the victim was because the victim was attempting to get the gun from him.
Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). In deciding whether death is a proportionate penalty and to ensure uniformity in the imposition of the death sentence, this Court reviews and considers all the circumstances in a case relative to other capital cases. See Johnson v. State, 720 So.2d 232, 238 (Fla.1998); Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). The death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
In the present case, the trial court found three aggravators: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person,[12] (2) the capital felony was committed while the defendant was engaged in the commission of or in an attempt to commit the crime of robbery,[13] and (3) the crime was committed for the purpose of avoiding *437 or preventing a lawful arrest or effecting an escape from custody. The first two aggravators were conceded at trial by Bryant, and the third is not challenged here. The court did not find the existence of any statutory mitigating circumstances, but did find the existence of the nonstatutory mitigator of remorse; however, because of Bryant's subsequent actions, very little weight was accorded this circumstance. Upon these facts, the judge imposed the death penalty.
In arguing that death is a disproportionate penalty in this case, Bryant relies on this Court's prior decisions in Robertson v. State, 611 So.2d 1228 (Fla.1993), Shere v. State, 579 So.2d 86 (Fla.1991), and McKinney v. State, 579 So.2d 80 (Fla.1991). These cases discuss whether multiple gun shots, by themselves, establish the heinous, atrocious, or cruel aggravator. Such aggravator was not requested by the State, nor was it found by the trial court, and therefore these cases are not applicable here.
Bryant also argues that the death penalty is disproportionate here because, although he intended to commit an armed robbery when he entered Andre's Market, he did not enter the store with the premeditated design to kill Andre, and the shooting of Andre was an impulsive action in response to Andre's resistance to the robbery. In Mendoza v. State, 700 So.2d 670, 679 (Fla.1997), however, this Court rejected a strikingly similar argument, where the defendant argued that the death penalty was disproportionate "because the murder was not planned but was committed on the spur of the moment during a robbery gone awry," and that "the shooting of [the victim] was a reflexive action in response to [the victim's] resistance to the robbery." Rather, this Court affirmed the defendant's death sentence in Mendoza based upon only two of the aggravating factors found against Bryant (i.e., previous conviction of violent felony and murder committed during commission of robbery). See Mendoza, 700 So.2d at 672.
Moreover, this Court has upheld death sentences in other cases based upon only two of the three aggravating factors present in the instant case. See Pope v. State, 679 So.2d 710 (Fla.1996) (holding death penalty proportionate where two aggravating factors of murder committed for pecuniary gain and prior violent felony outweighed two statutory mitigating circumstances of commission while under influence of extreme mental or emotional disturbance and impaired capacity to appreciate criminality of conduct and several nonstatutory mitigating circumstances); Melton v. State, 638 So.2d 927 (Fla.1994) (holding death penalty proportionate where two aggravating factors of murder committed for pecuniary gain and prior violent felony outweighed some nonstatutory mitigation); Heath v. State, 648 So.2d 660 (Fla.1994) (affirming defendant's death sentence based on presence of two aggravating factors of prior violent felony and murder committed during course of robbery, despite the existence of the statutory mitigator of extreme mental or emotional disturbance). Accordingly, we find that death is a proportionate penalty in this case.
Last, Bryant claims electrocution is cruel and unusual punishment. This Court, however, has repeatedly rejected various challenges to the death penalty statute as raised by Bryant. See, e.g., Provenzano v. Moore, 744 So.2d 413 (Fla. 1999), cert. denied, 528 U.S. 1182, 120 S.Ct. 1222, 145 L.Ed.2d 1122 (2000); Jones v. State, 701 So.2d 76, 79 (Fla.1997). Further, the Florida Legislature amended the death penalty statute to provide that execution shall be by lethal injection unless the sentenced person affirmatively elects *438 to be executed by electrocution. See § 922.105, Fla. Stat. (2000). Accordingly, there is no merit to Bryant's claim, and the sentence imposed should be affirmed.
For the reasons stated above, we affirm Bryant's convictions and sentences.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, PARIENTE, LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., concurs as to the conviction and concurs in result only as to the sentence.
NOTES
[1] This is Bryant's second direct appeal from a sentence of death. Previously, in Bryant v. State, 656 So.2d 426, 429 (Fla.1995), we reversed Bryant's convictions for first-degree murder and robbery and vacated the death sentence imposed, finding that the trial court's absence during the recitation of testimony without a valid waiver by the defendant constituted reversible error.
[2] Here, the trial court considered a variety of lay and expert evidence in making its determination as to whether Bryant was competent to stand trial. The evidence included: the report and testimony of Dr. Stephen Alexander, a licensed psychologist; the report and testimony of Susan Hession, a licensed mental health counselor with twenty-five years experience, who also examined Bryant during his first trial; the report and testimony of Bryant's own expert, Dr. Antoinette Appel; and testimony from Sheriff's officers regarding Bryant's behavior while incarcerated.
[3] Alexander and Hession each opined that Bryant was competent to stand trial. Although Appel testified that Bryant was, in her opinion, not competent to stand trial, she also testified that Bryant: understood the State Attorney was attempting to prove he committed a crime and it was an adversarial process; knew the meaning of proof and self-incrimination as well as the difference in the roles of prosecutor, defense counsel, judge, and jury; understood he had to be found guilty by each juror before sentencing; grasped what "punishment" was and that he faced the death penalty; could testify relevantly; understood the appellate process, knew who his counsel was, and comprehended that he was charged with a crime which carried certain penalties; and fathomed the difference between legal and illegal.

On April 13, 1998, the trial court held a hearing with regard to the supplementing of the record. At this hearing, Hession testified that, based upon her review of Bryant's corrections records, she still felt Bryant was competent. Deputy Sheriff James Rogers testified that he had the opportunity to supervise and observe Bryant during fifteen-minute intervals over the "last six or eight months" and that he did not observe Bryant suffering any mental defect or infirmity. Rather, he saw Bryant give "legal advice" in return for canteen items, and "observed [Bryant] on numerous occasions both reading and writing [in his cell]." Deputy Sheriff Joseph Pederson had similar opportunity to observe Bryant providing legal advice and testified that there was nothing he observed that would indicate that Bryant suffered any mental defect or infirmity. See Hardy, 716 So.2d at 763-64 (holding testimony from jail employees regarding a defendant's conduct is relevant in determining competency). Also during penalty phase proceedings, Greg Otto, a licensed clinical social worker called by the defense, testified that while interviewing Bryant, he had no reason to question Bryant's competency or understanding.
[4] A review of the record also reveals that Judge Mounts was also aware that Bryant had thrown a book at Judge Colbath during a previous proceeding in 1991. Moreover, the record reveals that Judge Mounts was aware that Bryant, at the time of his retrial, had been charged with aggravated assault based on an incident that occurred while he was in custody. The defense did not dispute that any of these acts had occurred.
[5] The following colloquy occurred after defense counsel's request for an evidentiary hearing regarding the decision to restrain Bryant:

[THE COURT]: All right, I don't need an evidentiary hearing. I was present and saw the throwing of a huge heavy chair and witnessed it along with everybody else that's in the courtroom. I have never seen a more violent act in a Court of law in all of my years, which is, I guess, 38, 39, somewhere in there, and also it's not part of this record yet, but this, the Appellate Court, your client is charged, not convicted, but charged, I believe, with an aggravated battery that occurred while he was confined and it is my understanding that that charge is going to go forward to trial, is that correct?
[MR. GALO (prosecutor)]: State's intentions, yes, sir, Your Honor.
. . . .
[THE COURT]: Well, I don't know what the date of the alleged aggravated battery while confined was but that occurred after the throwing of the chair and the throwing of the chair, of course, occurred after the book was thrown at Judge Colbath, not in the direction of Judge Colbath, but at Judge Colbath, according to the accounts I have heard.
[6] It should also be mentioned that, from the very outset of Bryant's retrial, the trial court offered Bryant the opportunity to wear an electronic restraining belt which could be concealed underneath his clothingand would not have been visible to the jury. Insofar as Bryant complains about the visibility of the restraints, he has only himself to blame.
[7] In rejecting lack of education as a mitigating circumstance, the trial court included the following statement in its sentencing order: "Defense witness Mark Gaines testified that the Defendant was a good student through the twelve years they attended school together." Sentencing Order at 8, State v. Bryant, No. 92-791A02 (Fla. 15th Cir.Ct. Feb. 5, 1999). In actuality, Gaines, a business owner and church deacon, testified that he and Bryant went to school together from preschool until Bryant, at age thirteen, moved from Connecticut to Florida.
[8] Recently, in Trease v. State, 768 So.2d 1050 (Fla.2000), the Court partly receded from Campbell and held that though a court must weigh all the mitigating circumstances, the court may assign "little or no" weight to such factors as warranted by the relevant circumstances.
[9] It should also be noted that, in its eleven-page sentencing order, the trial court specifically addressed "each" of the other mitigating factors presented by Bryant in opposition of the death penalty, i.e., age, lack of education, neurological impairment, remorse, sentence disproportionate to that of codefendant, and lack of premeditation, as required by Campbell.
[10] Defense expert Appel testified that Bryant suffered from sickle cell anemia, post-traumatic seizures, a concussion caused by being hit in the head with a pipe, meningitis, and a lacerated dura. In Appel's opinion, Bryant's brain damage caused a lack of impulse control which related to an incident like the one before the trial court in that Bryant was unable to avoid impulsive behavior and impaired judgment, especially under stressful situations.
[11] We have also said: "The possibility of organic brain damage ... does not necessarily mean ... that one may engage in violent, dangerous behavior and not be held accountable. There are many people suffering from varying degrees of organic brain disease who can and do function in today's society." James v. State, 489 So.2d 737, 739 (Fla.1986).
[12] Bryant has been previously convicted of sexual battery, grand theft, robbery with a weapon, and aggravated assault with a mask. See State v. Bryant, No. 89-166116CF A02 (Fla. 15th Cir.Ct. Dec. 4, 1990); State v. Bryant, No. 92-2538CF A02 (Fla. 15th Cir.Ct. Dec. 16, 1992).
[13] Bryant was also convicted of the armed robbery of Leonie Andre, the wife of the victim in this case. See State v. Bryant, No. 92-791CF A02 (Fla. 15th Cir.Ct. Feb. 13, 1998).